IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

CHAD DUREN,[1]                    )
                                  )
        Plaintiff,                )
                                  )        NO. 1:18-cv-00084
v.                                )        JUDGE RICHARDSON
                                  )
DAVID BYRD, et al.,               )
                                  )
        Defendants.               )

## MEMORANDUM OPINION

Pending before the Court are two motions to dismiss (collectively, "Motions"). The first

motion was filed by Defendant Byrd, who asserts therein that the First Amended Complaint

("FAC") should be (i) dismissed in its entirety under Fed R. Civ. P. 12(b)(6) for failure to state a

claim and (ii) alternatively dismissed as to its requested injunctive and declaratory relief under Fed

R. Civ. P. 12(b)(1). (Doc. No. 82, "Defendant Byrd's motion"). The second motion was filed by

Defendants Wayne County School System ("Wayne County") and Franks (Doc. No. 84,

---

[1] Plaintiff previously filed this lawsuit under the pseudonym "John Doe," instead of his actual
name. The Magistrate Judge initially granted Plaintiff's Motion for a Protective Order (Doc. No.
32) seeking permission to litigate under a pseudonym ("John Doe"). The Magistrate Judge then
issued an order dated April 18, 2019 that, in pertinent part, denied Defendant Byrd's request to
compel Plaintiff to litigate instead under his real name. (Doc. No. 58 at 5-6). Defendants Wayne
County and Franks filed a Motion for Reconsideration (Doc. No. 63) with respect to that order,
and Defendant Byrd filed an Appeal and Objection (Doc. No. 65) with respect to that same order.
At issue on the Motion for Reconsideration and the Appeal and Objection was whether Plaintiff
should be allowed to continue to proceed in this action under the pseudonym. The undersigned
found that, based on the entire record and given the passage of time since entry of the original
protective order, the Magistrate Judge's Order was clearly erroneous and should be set aside. As a
result, the Defendants' Motion to Rescind Prior Order Granting Plaintiff's Motion for Protective
Order (Doc. No. 32) and their Motion for Reconsideration (Doc. No. 63) were granted, and the
Protective Order (Doc. No. 32) was vacated. Plaintiff now proceeds in this action under his actual
name, Chad Duren.

"Defendants Wayne County and Franks' motion"). In that motion and the memorandum of law in support of it (Doc. No. 85), Defendants Wayne County and Franks (i) adopt the arguments asserted in support of Defendant Byrd's motion, (ii) make additional arguments as to why that the FAC should be dismissed in its entirety (under Fed R. Civ. P. 12(b)(6)) or, alternatively, Fed. R. Civ. P. 12(c)) for failure to state a claim, and (iii) assert alternatively that Defendant Franks should be dismissed under the doctrine of qualified immunity.

Plaintiff filed a single response to both Motions. (Doc. No. 90). Defendants filed separate Replies. (Doc. Nos. 94, 95).

For the reasons discussed herein, the Court will grant each of the Motions.

## BACKGROUND[2]

At the time of the events in question here, Plaintiff, Chad Duren, was a public high school student at Wayne County High School located in Wayne County, Tennessee. (Doc. No. 33 at ¶ 7). Plaintiff brings this lawsuit against Wayne County; Ryan Franks, the Wayne County High School principal (in his individual and official capacities); David Byrd, a member of the Tennessee House of Representatives (in his individual and official capacitates); and John Does 1-99 (in their individual and official capacities) for violations of his constitutional rights under the First and

---

[2] The Court has taken these facts from the FAC (Doc. No. 33). As will be discussed at further length below, the Court does not necessarily have to accept the assertions in the FAC as true for purposes of a 12(b)(1) motion. However, in resolving a 12(c) motion, the Court must accept all factual allegations as true for purposes of ruling on the motion. The Court will explain further below why it construes these Motions as Motions under 12(b)(1) and 12(c). To the extent that allegations referred to below are legal conclusions, however, they are not accepted as true but rather are identified as merely what Plaintiff alleges, and not what the Court is accepting as true for purposes of the Motions. Finally, the Court notes that the parties do not appear to dispute the relevant facts for purposes of resolving these Motions.

Fourteenth Amendments (*Id.* at ¶ 1). Since filing this lawsuit, Plaintiff has graduated from high school. (Doc. No. 71 at 13 n. 8; Doc. No. 57 at 5; Doc. No. 57-10).[3]

Plaintiff claims that he was compelled to engage in political speech when Defendants Wayne County and Franks allegedly forced him to wear a "David Byrd" tee shirt on the school's traditional senior field trip, which (at least that year) was a visit to the Tennessee State Capitol building. (Doc. No. 33 at ¶ 2). At the time of the trip (October 15, 2018), Defendant Byrd was an incumbent running for re-election to the Tennessee House of Representatives. (*Id.* at ¶ 8). His re-election campaign was hotly contested because Defendant Byrd had been accused of sexual misconduct by numerous former Wayne County High School students. (*Id.* at ¶ 23). Defendant Byrd provided the tee shirts (with his name and logo on them) to Defendant Franks—who is Defendant Byrd's nephew—for the purpose of distributing them to Wayne County High School students. (*Id.* at ¶¶ 17, 23). Defendant Byrd later reflected in his campaign finance report that the tee shirts were an "in-kind" donation to his re-election campaign. (*Id.* at ¶ 17).

---

[3] As discussed below, the Court can consider facts outside of the FAC when addressing a 12(b)(1) motion. However, because this appears in the record of the case, the Court can also properly consider it on a 12(c) motion. *Barany-Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008) ("Although our decision [on a Rule 12(c) motion] rests primarily upon the allegations of the complaint, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint[ ] also may be taken into account." (internal quotation marks omitted)); *see also Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008); *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018). Notably, *Barany-Snyder* indicates that such things *may* be considered, not that they *must* be. The Court is very hesitant to "take[ ] into account" a factual assertion not in the complaint merely because it happens to appear somewhere "in the record of the case." But the Court does not have such qualms when the factual assertion seems undisputed and inherently credible. The factual assertion that Plaintiff has graduated from high school appears to fit this bill, and thus the Court accepts that assertion as true in resolving these Motions.

Prior to the trip, students and families received a voice mail instructing students to change into the "David Byrd" tee shirts before getting on the buses for the field trip. (*Id.* at ¶¶ 11, 12). The voice mail stated in part:

> Seniors should proceed straight to the cafeteria for roll call and you will receive your Senior '19 tee shirt from Representative Byrd. Once you receive your shirt, please go to the bathroom and change into it and then safely place the shirt you had on somewhere in the school. Buses will leave as soon as shirts have been distributed and we will return around the time school is out.

(*Id.* at ¶ 12). When students arrived at school for the trip, the tee shirts were on a table and school staff and personnel directed students towards the table to pick up a tee shirt. (*Id.* at ¶ 15). Plaintiff alleges that these actions by Defendant Wayne County staff—along with the fact that students were never told that wearing the tee shirts was optional[4]—made him feel compelled to wear the tee shirt on the trip. (*Id.*).

Plaintiff claims that the rest of the Wayne County High School students also believed wearing the "David Byrd" tee shirts was compulsory because every student who attended the trip wore one. (*Id.* at ¶ 18). Plaintiff alleges that in order to go on the trip, he would be required to choose one of two options, either of which would have resulted in compelled political speech: 1) wear the tee shirt, or 2) explain why he would not wear it.[5] (*Id.* at ¶ 15). Plaintiff further alleges

---

[4] Plaintiff asserts that students were never told that wearing the tee shirt was "optional." However, he does not allege that staff of Defendant Wayne County ever explicitly told students that wearing the tee shirt was mandatory to attend the trip. Instead, Plaintiff claims that the actions and representations made by school staff members "gave the impression" that wearing the tee shirt was mandatory. (Doc. No. 33. at ¶ 16). Specifically, to support his allegation that wearing the tee shirts was mandatory, Plaintiff focuses on the use of the word "should" in the voice mail, as well as the fact that school staff directed students towards the table where the tee shirts were located. (*Id.* at ¶¶ 12, 15).

[5] The FAC is not ideally clear on this point, in part because of an unfortunate apparent omission of the phrase "to explain" before the word "why" in the third sentence of paragraph 15 of the FAC. The FAC states "The actions, words, and statements of Wayne County School staff, that Plaintiff had to receive a shirt and he should put it on, compelled Plaintiff to either wear the shirt or

that rather than choosing either of these options, he "chose not to go" on the class trip. (*Id.* at ¶ 45).

In other words, as best the Court can tell, Plaintiff alleges that he was *compelled* to choose one of these two options (because failure to do so was punishable by exclusion from the class trip), which in turn means that he was compelled to engage in political speech. The Court notes that Plaintiff never explicitly claims in the FAC that he himself ultimately had to explain his choice not to attend the trip or wear the tee shirt. Instead, Plaintiff seems to claim that he left before the trip started without doing either, though this is unclear.

_____

compelled Plaintiff why he did not want to wear the shirt." At the end of the relevant paragraph, Plaintiff rephrases his statement with another typo, this time saying "or explain whay": "In other words, Wayne County School staff's policy and custom of distributing politically-themed shirts on school grounds using school staff, and co-opting students to wear such shirts at a school-sponsored event, compelled Plaintiff to engage in political speech (i.e. wear the shirt as instructed) or explain whay [sic] he should not wear it." Apparently, Plaintiff alleges here that to be permitted to go on the trip, Plaintiff (or any other student in his class) would either have to wear the tee shirt or explain his or her refusal to wear it—and that therefore, Plaintiff was forced (compelled) to either wear the tee shirt or explain the refusal to do so.

Strangely, Plaintiff's location of the parenthetical in the above quotation seems to indicate that he claims only that wearing the tee shirt would result in compelled political speech (and not that the alternative of explaining a refusal to wear the tee shirt would result in compelled political speech). If the Court were to construe Plaintiff's allegation here in this manner, that would be devastating to his position, as it would suggest that Plaintiff himself effectively concedes that he could choose an option that would not result in compelled political speech—which is tantamount to say that he never faced compelled political speech to begin with, even if he is properly considered to have been "forced" to choose one option or the other because failure to do so would have cost him the opportunity to go on the trip.

But because Plaintiff conceivably did intend to allege that *either* of these options would have resulted in compelled political speech and merely failed (through sloppy drafting) to so indicate clearly, the Court (construing the allegations of the FAC in favor of Plaintiff as required) will assume that this was Plaintiff's intent. Accordingly, the Court construes Plaintiff as alleging that he was forced, under pain of missing the trip, to partake in political speech by *either* 1) wearing the tee shirt or 2) explaining why he would not wear it.

Regardless of which of these things Plaintiff intended to allege was political speech (wearing the tee shirt, explaining why he would not wear the tee shirt, or both), the Court does not find that Plaintiff's First Amendment rights have been violated, as explained below.

On December 11, 2003, Defendant Wayne County had issued a policy stating that "Political literature shall not be distributed through the school to students, nor sent home to parents, nor placed in teachers' mailboxes, lounges, or on school premises." (*Id.* at ¶ 25). The policy further states that "No part of the school system, including the facilities, the name, the staff, and the students shall be used for advertising or promoting the interests of any commercial, political or other non-school agency or organization." (*Id.*). The policy also explicitly requires Defendant Franks, as principal of Wayne County High School, to screen all materials prior to distribution to "ensure their appropriateness." (*Id.*). Plaintiff claims that Defendants were aware of the official policy described above, yet repeatedly permitted staff of Defendant Wayne County to distribute "political literature" to students through school staff personnel. (*Id.* at ¶ 27).

Based on these allegations, Plaintiff asserts four claims, each one under 42 U.S.C. § 1983.[6] In the first three counts, Plaintiff claims that each Defendant[7] violated his constitutional rights under the First and Fourteenth Amendments based on compelled speech (Count I), school-sponsored speech (Count II), and selective enforcement (Count III). Plaintiff brings an additional

---

[6] As the Sixth Circuit has explained, Section 1983

> provides a remedy for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" with respect to actions taken by persons acting "under color of any statute, ordinance, regulation, custom, or usage, of any State." 42 U.S.C. § 1983. To prevail on a claim brought under § 1983, a plaintiff must prove that he was deprived of a right secured by the Constitution or laws of the United States and that the deprivation was caused by a person acting under color of law. *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015).

*Lang v. City of Kalamazoo*, 744 F. App'x 282, 285–86 (6th Cir. 2018).

[7] Despite the use of the phrase, "all Defendants," it is unclear which (if any) claims are lodged specifically against Defendants John Does 1-99. Though they are listed in the case caption, Plaintiff mentions Defendants John Does 1-99 only in two places, each time when listing all of the Defendants. (Doc. No. 33 at ¶¶ 1, 30). It is unclear to the Court who these Defendants are, what positions they hold, or how they are related to this lawsuit.

claim (Count IV) against only Defendants Byrd and Franks (in their individual capacities) alleging that they conspired to violate the constitutional rights of students at Wayne County High School, including Plaintiff. Specifically, Plaintiff argues that the alleged use of school resources to promote political candidates, political campaigns, and partisan politics is a violation of his First Amendment rights to freedom of speech and freedom of association. (*Id.* at ¶ 28). Plaintiff further claims that requiring him to wear the tee shirt in order to attend the trip violated his constitutional right not to engage in political speech. (*Id.* at ¶ 15).

Plaintiff claims that, as a result of Defendants' actions (and his missing the trip in response to Defendants' actions), he suffered "harm," emotional distress, fear, shame, and humiliation. (*Id.* at ¶¶ 16, 45, 46, 50, 62, 80). Plaintiff seeks money damages, injunctive relief, and declaratory relief. (*Id.* at ¶ 83). To support his claim for relief, Plaintiff asserts that Defendant Wayne County has a long-standing policy of sponsoring non-neutral, political speech and that he is entitled to injunctive relief to prevent this from happening again in the future.[8] (*Id.* at ¶¶ 9, 21, 64).

A previous motion to dismiss was filed by Defendant Byrd, and Defendants Wayne County and Franks filed a notice indicating that they joined the motion to dismiss and adopted the arguments contained therein. (Doc. Nos. 39, 62, "Defendants' prior motion to dismiss"). In the prior motion to dismiss, Defendants asserted that Plaintiff failed to plead a judicially cognizable injury-in-fact, meaning that he lacked standing and that therefore Court lacked subject-matter jurisdiction and must dismiss this action under Fed. R. Civ. 12(b)(1). (Doc. Nos. 39, 40). The Court ultimately denied the prior motion to dismiss, finding that Plaintiff has standing to bring this

---

[8] Plaintiff claims Defendant Wayne County has allowed this alleged compelled political speech to occur for at least the past four years and that it will "likely continue as long as David Byrd is eligible to run for office and his nephew is the Principal of Wayne County High School." (Doc. No. 33 at ¶¶ 9, 21).

lawsuit. (Doc. Nos. 73, 74); *Doe v. Byrd*, No. 1:18-CV-00084, 2020 WL 1285428 (M.D. Tenn. Mar. 18, 2020) (Richardson, J.). The present Motions argue, collectively, that Plaintiff's declaratory and injunctive relief claims are moot, that the individual Defendants are entitled to qualified immunity, that the official capacity claim(s) against Defendant Franks are subject to dismissal as duplicative of the claims against Defendant Wayne County, and (in an argument of especial significance to Wayne County) that Plaintiff's claims are—irrespective of the applicability of qualified immunity—all subject to dismissal for failure to state a claim.

The particular array of Defendants, kinds of claims against particular Defendants, and arguments made in the Motions is rather confounding. And the same can be said about the relationship between the Defendant-specific claims of Plaintiff and the arguments made in the Motions. The confusion is compounded somewhat by the reality that it is not always clear what Plaintiff is claiming in the FAC or what Defendants are asserting in the Motions (or why they are asserting it). Below, the Court takes pains to be meticulous in keeping straight, and explaining (in part via footnotes), all of the various claims, all of the various arguments in support of dismissal of the claims, all of Plaintiff's assertions that those arguments are procedurally improper at this stage, and the particular relationship between the various arguments that Defendants make via the Motions.

## LEGAL STANDARD[9]

A. Subject-Matter Jurisdiction

Rule 12(b)(1) "provides for the dismissal of an action for lack of subject matter jurisdiction." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). "Subject matter jurisdiction

---

[9] As discussed below, the Court finds that the Motions are properly brought as 12(b)(1) and 12(c) motions and rules on them herein on the merits. The Court here lays out the applicable standards and will explain below why these standards apply to the present Motions.

is always a threshold determination." *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007).

There are two types of motions to dismiss for lack of subject-matter jurisdiction: facial and factual attacks. *Gentek Bldg. Products, Inc. v. Sherman-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). A facial attack questions merely the sufficiency of the pleading. When reviewing a facial attack, a district court takes the allegations in the complaint as true. *Id.* If those allegations establish federally-cognizable claims, jurisdiction exists. *Id.* A factual attack instead raises a factual controversy concerning whether subject-matter jurisdiction exists. *Id.*

Where there is a factual attack on the subject-matter jurisdiction of the court under Fed. R. Civ. P. 12(b)(1), no presumptive truthfulness applies to the complaint's allegations; instead, the court must weigh the conflicting evidence to arrive at the factual predicate that subject-matter jurisdiction does or does not exist. *Gentek Bldg. Products, Inc.*, 491 F.3d at 330. "[T]he district court has considerable discretion in devising procedures for resolving questions going to subject matter jurisdiction[.]" *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 327 (6th Cir. 1990). The Sixth Circuit has noted that:

> The factual attack, however, differs greatly for here the trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. Pro. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

*RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 890 (3d Cir. 1977)).

In making its decision, the district court has wide discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve jurisdictional facts.[10] *Gentek Bldg. Products, Inc.*, 491 F.3d at 330; *see also Nichols v. Muskingum Coll.*, 318 F.3d 674, 677 (6th Cir. 2003) ("In reviewing a 12(b)(1) motion, the court may consider evidence outside the pleadings to resolve factual disputes concerning jurisdiction, and both parties are free to supplement the record by affidavits."); *Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d 1187, 1192 (M.D. Tenn. 2017) (discussing *Gentek*). As always, the party invoking federal jurisdiction has the burden to prove that jurisdiction. *Global Technology, Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015); *Golden v. Gorno Bros.*, 410 F.3d 879, 881 (6th Cir. 2005).

The arguments that Plaintiff's requested declaratory and injunctive relief are moot constitute a factual attack on subject matter jurisdiction. *Enriquez-Perdomo v. Sessions*, No. CV 17-147-DLB-CJS, 2018 WL 934854, at *2 (E.D. Ky. Feb. 16, 2018) ("Because mootness is a threshold jurisdictional issue the Court reviews the Defendants' Motion on mootness as a factual attack." (internal citation omitted) (citing *WJW–TV, Inc. v. City of Cleveland*, 878 F.2d 906, 909 (6th Cir. 1989))). This is a factual attack because its success or failure hinges on the factual validity of the FAC's allegations. Therefore, the Court will exercise its discretion to resolve the Motion by reference to the record outside of Plaintiff's FAC.

B.  Judgment on the Pleadings

The Federal Rules of Civil Procedure provide that after the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings. Fed. R. Civ.

---

[10] None of the parties have requested an evidentiary hearing or pointed the Court to additional evidence they might submit at such a hearing. The Court therefore exercises its discretion to rule on the present Motions without an evidentiary hearing. *See e.g.*, *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 327 (6th Cir. 1990).

P. 12(c). "The pleadings are not closed until every defendant has filed an answer." *Nat'l Bankers Tr. Corp. v. Peak Logistics LLC*, No. 12-2268-STA-TMP, 2013 WL 3070843, at \*3 (W.D. Tenn. June 17, 2013). "Rule 12(c) may be employed as a vehicle for raising several of the defenses enumerated in Rule 12(b), including the defense of failure to state a claim upon which relief may be granted." *Amersbach v. City of Cleveland*, 598 F.2d 1033, 1038 (6th Cir. 1979); *see also Thomason v. Nachtrieb*, 888 F.2d 1202, 1204 (7th Cir. 1989) (citing *Amersbach*); *Becker v. Crounce Corp.*, 822 F. Supp. 386, 391 n. 4 (W.D. Ky. 1993) (citing *Amersbach*).

When that defense is raised via a motion for judgment on the pleadings, the district court evaluates the motion using the same standard applied to a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 437 n.1 (6th Cir. 1988); *Becker*, 822 F. Supp. at 391 n.4 (W.D. Ky. 1993) (citing *Amersbach*); *Kinney v. Mohr*, No. 2:13-cv-1229, 2017 WL 1395623, \*4 (S.D. Ohio Apr. 19, 2017) (citing *Amersbach*); *Clemons v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, No. 3-14-1690, 2015 WL 4717398, at \*1 (M.D. Tenn. Aug. 7, 2015). "Thus, the same rules which apply to judging the sufficiency of the pleadings apply to a Rule 12(c) motion as to a motion filed under Rule 12(b)(6)[.]" *Lacy v. Ohio Dept. of Job and Family Servs.*, No. 2:16-cv-912, 2017 WL 1397522, \*1 (S.D. Ohio Apr. 19, 2017) (citing *Amersbach*). Indeed, when a Rule 12(c) motion is based on an asserted failure to state a claim upon which relief can be granted, "[t]he only difference between Rule 12(c) and Rule 12(b)(6) is the timing of the motion to dismiss." *Ruppe v. Knox Cty. Bd. Of Educ.*, 993 F. Supp. 2d 807, 809 (E.D. Tenn. 2014) (quoting *Hunter v. Ohio Veterans Home*, 272 F. Supp. 2d 692, 694 (N.D. Ohio 2003)). In summary, the applicable standard for these Motions is the standard for motions under Rule 12(b)(6).

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and their progeny provide the applicable standard for motions to dismiss for failure to state a claim under Rule 12(b)(6). For purposes of a motion to dismiss, the Court must take all of the factual allegations in the complaint as true. *Id.* at 678. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*. at 678; *Fritz v. Charter Township of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010); *Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018).

Consistent with these principles, the Sixth Circuit has noted that "[t]o survive a Rule 12(c) motion, 'a complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory.'" *Hindel v. Husted*, 875 F.3d 344, 346–47 (6th Cir. 2017) (quoting *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007)).

As a general rule, if matters outside the pleadings are presented on a Rule 12(c) motion and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). *Max Arnold & Sons, LLC v. W.L. Hailey & Co.*, 452 F.3d 494, 503 (6th Cir. 2006) ("Because Plaintiff presented matters outside of the pleadings with respect to Defendant's Rule 12(c) motion, and because the district court did not exclude these matters, the district court should have converted the Rule 12(c) motion to a motion for summary judgment.").

This applies even if the non-excluded material outside the pleadings is not actually relied upon or even considered at all by the court. *See id.* However, "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint[ ] also may be taken into account." *Barany-Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008) (quoting *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)).

## DISCUSSION

Each of the Motions raises (on behalf of one of the two individual Defendants) the issue of qualified immunity. Defendants Wayne County and Franks' motion raises, separately from the issue of qualified immunity, the issue of whether the FAC adequately alleges a constitutional violation. Moreover, Defendant Byrd's motion (which has been adopted by the other two Defendants) raises the issue of mootness.[11] (Doc. Nos. 83, 85). In Plaintiff's Response, Plaintiff addresses the merits of the Motions, and also asserts that the Motions are procedurally improper because, according to Plaintiff, (a) Defendant waived the right to file them under Fed. R. Civ. P. 12(b) due to their filing of the prior motion to dismiss; and (b) the Motions were filed too early (*i.e.*, before all Defendants filed an answer to the FAC) to be cognizable as motions for judgment on the pleadings under Fed. R. Civ. P. 12(c). (Doc. No. 90). Therefore, the Court first discusses whether the present Motions are proper and then, after answering that question in the affirmative, turns to the merits of the Motions.

---

[11] Defendant Byrd suggests that his argument regarding mootness is made in the alternative. However, qualified immunity does not protect Defendants from claims for injunctive and declaratory relief. *Flagner v. Wilkinson*, 241 F.3d 475, 483 (6th Cir. 2001) ("The defense of qualified immunity protects officials from individual liability for money damages but not from declaratory or injunctive relief."). Thus, the mootness argument, applying only to things (forms of relief) to which qualified immunity does not apply, is not an "alternative" argument in the sense of being a second basis to prevail on the same points on which the first argument provides grounds to prevail.

A. <u>Whether the Motions were procedurally improper due to the filing of a prior motion to dismiss and/or due to their predating the filing of all Defendants' answers</u>

As noted above, Defendant Byrd (alone) and Defendants Wayne County and Franks (jointly) bring two separate motions. (Doc. Nos. 82, 84). Defendant Byrd's Motion is brought as one to dismiss under 12(b)(6) based on the purported applicability of qualified immunity (Doc. No. 82 at 1; Doc. No. 83 at 1, 3) and under 12(b)(1) for lack of subject-matter jurisdiction based on purported mootness. (Doc. No. 82 at 1). Defendants Wayne County and Franks' Motion asserts that (i) Plaintiff has failed to state a claim against either of these Defendants because (according to these Defendants) Plaintiff has failed to allege a constitutional violation and, relatedly, (ii) that Defendant Franks is entitled to qualified immunity; their motion is characterized primarily as a motion to dismiss under Rule 12(b)(6) but alternatively as a motion for judgment on the pleadings under Rule 12(c).[12] Defendants Wayne County and Franks additionally have adopted the mootness argument in Defendant Byrd's Motion. (Doc. No. 85 at 1; Doc. No. 94 at 1). Defendant Byrd in turn has adopted the arguments presented in Defendants Wayne County and Franks' Motion and briefing. (Doc. No. 95 at 1).

At the time of filing their respective Motions, Defendant Byrd had not yet filed an answer, but Defendants Wayne County and Franks had filed a joint answer (Doc. No. 41).[13] In his Response, Plaintiff argues that the Motions are improper because their filing violates Fed. R. Civ.

---

[12] These Defendants call this motion a "Motion to Dismiss or, alternatively, Motion for Judgment on the Pleadings pursuant to Rule 12((b) [sic] or (c) of the Federal Rules of Civil Procedure." (Doc. No. 84 at 1).

[13] In the Response, Plaintiff indicates that no Defendant has filed an answer, (Doc. No. 90 at 3) but that was incorrect because Defendants Wayne County and Franks had filed their joint answer by then.

P. 12(g) and because a Fed. R. Civ. P. 12(c) motion for judgment on the pleadings would be premature. (Doc. No. 90 at 2).

The Court will first discuss whether Defendant Byrd's filing of a 12(b)(1) motion was improper, then discuss whether Defendants Byrd's and Defendant Wayne County and Defendant Franks's respective filings of 12(b)(6) motions were improper.[14]

    1. *Subject Matter Jurisdiction: 12(b)(1)*

As indicated above, mootness is an issue of subject matter jurisdiction because if a claim is moot, the federal court lacks the jurisdiction to consider it. *E.g.*, *In re Rosenfeld*, 535 B.R. 186, 190 (Bankr. E.D. Mich. 2015), *aff'd*, 558 B.R. 825 (E.D. Mich. 2016), *aff'd*, 698 F. App'x 300 (6th Cir. 2017); *Enriquez-Perdomo*, 2018 WL 934854, at *2.

A challenge to subject-matter jurisdiction cannot be waived by the filing of a prior motion under Fed. R. Civ. P. 12, even if the prior motion raised the issue of subject matter jurisdiction. *E.g.*, Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *Polite v. Rendell*, No. CIV.A. 08-CV-5329, 2010 WL 1254334, at *1 (E.D. Pa. Apr. 1, 2010) ("Under Rule 12(b)(1), a motion to dismiss for lack of subject matter jurisdiction may be raised at any time."). It follows that a party may file a motion challenging subject-matter jurisdiction under Rule 12(b)(1) even if it previously filed a Rule 12(b)(1) motion.[15] *Pro. Serv. Indus., Inc. v. Dynamic Dev. Co., LLC*, No. 14-CV-06363, 2018 WL

---

[14] As noted herein, Defendant Wayne County and Defendant Franks' motion was alternatively characterized as a Rule 12(c) motion.

[15] That is not to say, of course, that a party should file a Rule 12(b)(1) motion that merely raises the same arguments previously rejected by the court on an earlier Rule 12(b)(1) motion. But that is not the situation here.

3389705, at *3 (N.D. Ill. July 12, 2018) (discussing that 12(b)(1) motions can be brought at any time in litigation and that a party may file multiple 12(b)(1) motions).

In short, the present 12(b)(1) mootness argument could not have been, and was not, waived by the filing of the previous motion to dismiss. Thus, the Court will consider the mootness argument asserted via Defendant Byrd's Motion.

### 2. *Qualified immunity and, relatedly, failure to state a claim: 12(b)(6) and 12(c)*

As indicated above, the two individual Defendants assert in their respective motions that they are entitled to qualified immunity and thus are entitled to dismissal. In so asserting, as further indicated above, Defendant Byrd invokes Rule 12(b)(6) (Doc. No. 83 at 3), and Defendant Franks invokes Rule 12(b)(6) and alternatively Rule 12(c). And Defendant Wayne County and Defendant Franks (primarily for the benefit of Defendant Wayne County, as noted above in a footnote) additionally invoke Rule 12(b)(6) and alternatively Rule 12(c) to assert failure to state a claim without reference to the doctrine of qualified immunity.

A defendant's "entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point . . . ." *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015) (cleaned up). Thus, the defense of qualified immunity properly can be asserted under Fed. R. Civ. P. 12(b)(6). *E.g.*, *Peatross v. City of Memphis*, 818 F.3d 233, 240 (6th Cir. 2016) ("Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the defendant is entitled to a meritorious affirmative defense such as qualified immunity."). And it likewise can be asserted in a motion under Rule 12(c), as evidenced by myriad cases in which defendants have done so without procedural objection from the plaintiff or the court. True, in many cases the defense may be better suited for the summary-judgment stage, thus portending

its rejection if asserted earlier in a motion under Rule 12. *Wesley*, 779 F.3d at 433-34 (noting that the earliest possible point to resolve a defendant's entitlement to qualified immunity "is *usually* summary judgment and not dismissal under Rule 12" (emphasis added)); *id.* at 433 ("[I]t is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity."); *Moderwell v. Cuyahoga Cty., Ohio*, 997 F.3d 653, 661 (6th Cir. 2021) ("it is generally inappropriate for a . . . court to grant a [12(c) motion for judgment on the pleadings] on the basis of qualified immunity." (ellipsis and brackets in original) (quoting *Wesley*, 779 F.3d at 433)). But in noting that the defense of qualified immunity is prone to rejection when asserted as a 12(b)(6) or 12(c) motion, the Sixth Circuit makes clear that the defense indeed can be asserted in that manner. And the Supreme Court has indicated that the defense of qualified immunity ideally would be recognized, if valid, early indeed—before discovery even starts. *See Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009) ("[W]e have made clear that the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that '"insubstantial claims" against government officials [will] be resolved prior to discovery.'" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n. 2, (1987)).

Defendant Wayne County does not (and, as discussed below, cannot) assert the defense of qualified immunity. Rather it (and, for that matter, its co-filer, Defendant Franks) argues—outside of the rubric of qualified immunity—that Plaintiff has failed to state a claim because (according to these Defendants) Plaintiff has failed to allege a constitutional violation.[16] And the defense of

---

[16] Defendant Franks (and, for that matter, Defendant Byrd) actually does not need to rely on this separate argument, because if it is valid, then he is entitled to qualified immunity and thus is entitled to dismissal anyway, irrespective of this separate argument. This is because, as discussed below, the absence of a plausibly alleged constitutional violation means that individual defendants are entitled to qualified immunity. On the other hand, as further discussed below, individual defendants *alternatively* are entitled to qualified immunity if the plaintiff, though adequately alleging a constitutional violation, has not adequately alleged a violation of a *clearly established*

failure to state a claim (relied on primarily by Defendant Wayne County) can be asserted either under Rule 12(b)(6) or Rule 12(c). *See* Fed. R. Civ. P. 12(b)(6) & (h)(2)(B).

Under Fed. R. Civ. P. 12(g)(2): "Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." The Sixth Circuit has explained that:

> Subdivision (g) contemplates the presentation of an omnibus pre-answer motion in which defendant advances every available Rule 12 defense and objection he may have that is assertable by motion. He cannot delay the filing of a responsive

---

constitutional right, *i.e.*, alleged that the individual defendants reasonably should have known that their actions effected a constitutional violation. Manifestly, this alternative basis for qualified immunity sets for defendants a bar that typically would prove lower than the bar set by the first basis.

But municipal defendants, like Wayne County, are ineligible for the defense of qualified immunity. This means that municipal defendants cannot rely on the alternative basis for dismissal contemplated by qualified immunity (lack of a plausibly alleged violation of *a clearly established* constitutional right), and instead must rely on the (typically more challenging) first basis (lack of a plausibly alleged violation of *a* constitutional right). For this reason, it makes sense that the motion of the joint filers (Defendant Wayne County and Defendant Franks) would alternatively make an assertion of failure to allege a constitutional violation *untethered to any claim of qualified immunity*, while Defendant Byrd would not bother to do so and instead would assert failure to allege a constitutional violation only in connection with a claim of qualified immunity.

On the other hand, if an individual defendant can prevail by showing that the plaintiff has not adequately alleged a constitutional violation, the defendant is entitled to dismissal on that basis, without any need to address the rubric of qualified immunity. *See, e.g.*, *Prado v. Mazeika*, No. 3:16-CV-00320, 2018 WL 4521935, at *8 (S.D. Ohio Sept. 21, 2018) ("Plaintiff has not alleged sufficient facts to state any due process or equal protection claim. Accordingly, absent sufficient facts to allege constitutional violations, no qualified immunity analysis is necessary."). So on a motion under Rule 12(b)(6) or 12(c), an individual defendant is free to make a general failure-to-state-a-claim argument instead of (or, as in the case of Defendant Franks, in addition to) the qualified-immunity argument. But as the qualified-immunity argument allows the defendant to seek to prevail based *either* on that same general failure-to-state-a-claim (failure to adequately allege a violation of a constitutional right) argument, *or* on the typically more easily established alternative argument that the plaintiff failed to adequately allege the violation of a *clearly established* constitutional right, an individual defendant might wish to assert only the qualified immunity argument. In other words, the qualified-immunity argument encompasses the general failure-to-state-a-claim argument and allows for an additional (and typically easier) argument to boot.

pleading by interposing these defenses and objections in piecemeal fashion but must present them simultaneously. Any defense that is available at the time of the original motion but is not included, may not be the basis of a second pre-answer motion.

*Eng. v. Dyke*, 23 F.3d 1086, 1090 (6th Cir. 1994) (quoting *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 701 (6th Cir. 1978)).

The Court does have discretion to allow successive 12(b) motions when doing so upholds the spirit of Rule 12(g). For example, a court in this district has previously allowed a successive motion under 12(b)(6) after a previous 12(b) motion attacked the court's subject-matter jurisdiction:

> this court chooses to exercise its discretion in adherence to the spirit of the law as opposed to the letter of the law in light of the fact that Defendant's earlier motion to dismiss challenged the court's subject matter jurisdiction. Although Defendant has not offered an explanation for its failure to file its 12(b) motion earlier, there is no evidence that this motion was filed simply to delay the action or to create an inconvenience for Plaintiff. There is also no reason to think that Defendant's motion has imposed or will impose undue hardship upon Plaintiff. In short, allowing Defendant to file this motion will not create an unjust delay or facilitate an abuse in motion practice. Therefore, this court will proceed to address the merits of Defendant's motion to dismiss.

*Fed. Exp. Corp. v. U.S. Postal Serv.*, 40 F. Supp. 2d 943, 948–49 (W.D. Tenn. 1999); *see also Brooks v. Hoffman*, No. 3:13-CV-278, 2014 WL 2818991, at *2 (E.D. Tenn. June 19, 2014); *Davis v. City of Dearborn*, No. 2:09-CV-14892, 2010 WL 3476242, at *4–5 (E.D. Mich. Sept. 2, 2010); *Adams v. Tennessee*, No. 3:04-cv-00346, 2011 WL 3236609, at *3 (M.D. Tenn. July 29, 2011); *SBAV, LP v. Porter Bancorp, Inc.*, No. 3:13-CV-710, 2014 WL 1257018, at *10 (W.D. Ky. Mar. 26, 2014).

Though at the time of the Response Defendant Byrd had not filed his answer, he has since (before the Replies were filed) filed his answer. (Doc. No. 93). Therefore, the pleadings were not closed when these Motions were filed, but they have since closed with the filing of Defendant

Byrd's answer. The Court notes that the previous motion to dismiss (Doc. No. 39), which was denied by the Court in an order (Doc. No. 74) predating the filing of the instant Motions, challenged subject-matter jurisdiction (specifically, standing)—so if qualified immunity had been asserted, that assertion could not and would not have even been reached by the Court unless (as did turn out to be the case) it rejected the motion's primary contention that the Court lacked subject-matter jurisdiction. The Court will not penalize Defendants for not previously raising an alternative argument that it would not even have reached if the Court had agreed with Defendants about (a lack of) subject-matter jurisdiction; in the Court's view, it is perfectly appropriate for a litigant to save resources by refraining from presenting merits-based arguments unless and until the Court decides whether it even has subject-matter jurisdiction. Because the pleadings have since closed, instead of considering the Motions as successive motions to dismiss, the Court will construe the Motions as requesting, among other things, judgment on the pleadings under Fed. R. Civ. P. 12(c) (which, as discussed above, applies the same standards as Fed. R. Civ. P. 12(b)(6)).

Thus, for the reasons discussed, the Motions are not procedurally improper and will be considered by the Court. Accordingly, the Court will first discuss whether it has subject-matter jurisdiction over Plaintiff's requests for injunctive and declaratory relief (or whether these claims are, instead, moot). Then, the Court will discuss whether the individual Defendants (Byrd and Franks) are entitled to qualified immunity as to the claims asserted against them in their official capacity. Next, the Court will discuss whether the claims against Defendant Franks in his official capacity are cognizable, and then conclude by addressing whether Plaintiff has stated a viable claim against Defendant Wayne County.

B. <u>Mootness</u>

Defendants[17] argue that Plaintiff's request for declaratory and injunctive relief (as opposed to monetary relief) is moot, because he has graduated high school since filing this action. (Doc. No. 83). Plaintiff responds that the doctrine of "capable of repetition but evading review" should apply. (Doc. No. 90 at 9-11).

A "plaintiffs' claims for injunctive and declaratory relief must be dismissed for lack of subject-matter jurisdiction [if] they have been rendered moot." *Strong v. Tennessee Bureau of Ethics & Campaign Fin., Reigstry of Election Fin.*, No. 3:15-CV-00739, 2017 WL 3394148, at *6 (M.D. Tenn. Aug. 8, 2017). "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). It is generally the case that "[w]hen students challenge the constitutionality of school policies, their claims for declaratory and injunctive relief . . . become moot when they graduate." *Mellen v. Bunting*, 327 F.3d 355, 364 (4th Cir. 2003) (collecting cases); *see also Doe v. Mount Vernon City Sch. Dist. Bd. of Educ.*, No. 2:08-CV-575, 2010 WL 1433301, at *14 (S.D. Ohio Apr. 6, 2010) ("In general, a claim for injunctive or declaratory relief is mooted in cases like this one when the student matriculates out of the school in which the alleged violation occurred.") (collecting cases); *Curry ex rel. Curry v. Sch. Dist. of the City of Saginaw*, 452 F. Supp. 2d 723, 743 (E.D. Mich. 2006), *aff'd on other grounds sub nom. Curry ex rel Curry v. Hensiner*, 513 F.3d 570 (6th Cir. 2008) ("The Court finds, however, that the request for declaratory and injunctive relief is moot because Joel matriculated out of the Hadley Middle School in 2004 (he was a fifth grader in December 2003 when he participated in the Classroom City project) and the injunction

---

[17] As noted, though this argument only appears in Defendant Byrd's motion, Defendants Wayne County and Franks also adopt it in their motion. (Doc. No. 85 at 1).

he seeks could provide no meaningful relief.") (collecting cases). Plaintiff does not appear to contest that, in light of such cases, his claims for declaratory and injunctive relief are moot.

But to say that claims are mooted is not necessarily to say that the Court lacks subject-matter jurisdiction over them. There is an exception to the rule that federal courts lack subject-matter jurisdiction over mooted claims. Specifically, the "capable of repetition but evading review doctrine" exception applies, and thus enables the court to exercise subject-matter jurisdiction, "where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 735 (2008) (citation omitted). "The party asserting that this exception applies bears the burden of establishing both prongs." *Lawrence v. Blackwell*, 430 F.3d 368, 371 (6th Cir. 2005). Plaintiff relies on this exception in seeking to avoid (partial) dismissal for lack of subject-matter jurisdiction based on mootness. But Plaintiff here clearly has not established the second prong of the "capable of repetition but evading review" exception. Plaintiff has not shown that he will ever be subject to the conduct at issue again.

Plaintiff cites cases indicating that the harm does not have to repeat as to Plaintiff specifically. (Doc. No. 90 at 10). However, the cases cited by Plaintiff were all in the context of election law, and even the primary case relied on by Plaintiff specifically explained that election law cases apply a different standard: "[c]ourts have applied the capable of repetition yet evading review exception to hear challenges to election laws even when the nature of the law made it clear that the plaintiff would not suffer the same harm in the future." *Lawrence v. Blackwell*, 430 F.3d 368, 372 (6th Cir. 2005). Plaintiff does not explain how these election law cases relate to the school context or why the Court should not apply the clear existing precedent that a declaratory or

injunctive action brought by a student who has graduated is moot. Therefore, the Court is unpersuaded by Plaintiff's citations to election case law, and it finds that the second prong of the "capable of repetition but evading review" exception is not met.

Thus, the Court finds that Plaintiff's requests for injunctive and declaratory relief are moot since he has graduated from high school. Therefore, the Court finds that it does not have subject-matter jurisdiction over Plaintiff's requests for injunctive and declaratory relief. Accordingly, the Court does not address the merits of those requests (or the merits of Plaintiff's claims as they relate to those particular requests), and instead addresses (below) the merits of Plaintiff's claims only in connection with his request for monetary damages.

C. Whether the individual Defendants are entitled to dismissal based on qualified immunity (or alternatively and relatedly, a failure to adequately allege a constitutional violation)

Defendants Byrd and Franks assert that they are entitled to qualified immunity. (Doc. Nos. 83, 85).[18] In his Response, in addition to arguing that the Motions were procedurally improper (as discussed above), Plaintiff also addressed Defendants' arguments on the merits. (Doc. No. 90).

"Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton,* 440 F.3d 306, 311 (6th Cir. 2006)*; see also Cahoo v. SAS Analytics Inc.,* 912 F.3d 887, 898 (6th Cir. 2019) ("'[T]he plaintiff bears the burden of showing that an officer is not entitled to the defense of

---

[18] It does not appear that Defendant Wayne County also is asserting that it is entitled to qualified immunity. And in any event, any such assertion would be without merit. "Qualified immunity is a personal defense that applies only to government officials in their individual capacities." *Benison v. Ross*, 765 F.3d 649, 665 (6th Cir. 2014). "It is well-established that the defense of qualified immunity is not available to a governmental entity." *Nichols v. Knox Cty., TN*, No. 3:11-CV-417, 2013 WL 12214450, at *2 (E.D. Tenn. Oct. 9, 2013). Thus, the Court discusses qualified immunity only as it relates to Defendants Byrd and Franks as sued in their individual capacities.

qualified immunity.'" (quoting *Courtright v. City of Battle Creek*, 839 F.3d at 513, 518 (6th Cir. 2016)).

To survive a motion to dismiss grounded on qualified-immunity, the plaintiff must allege facts that "plausibly mak[e] out a claim that the defendant's conduct violated a constitutional right that was clearly established [by] law at the time, such that a reasonable officer would have known that his conduct violated that right." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015). The plaintiff also must allege with particularity "facts that demonstrate what each defendant did to violate the asserted constitutional right." *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 564 (6th Cir. 2011) (internal citations, quotation marks, and emphasis omitted). "The test is whether, reading the complaint in the light most favorable to the plaintiff, it is plausible that an official's acts violated the plaintiff's clearly established constitutional right." *Id.* at 562-63.

In analyzing the issue of qualified immunity, the Sixth Circuit "follows a two-tiered inquiry to determine if an officer is entitled to qualified immunity." *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (internal quotation marks omitted). The "first step is to determine if the facts alleged make out a violation of a constitutional right. The second is to ask if the right at issue was 'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* (citing *Pearson*, 555 U.S. at 232). As set forth below, unless *both* questions are answered in the positive such that the plaintiff is said to have satisfied both steps,[19] the plaintiff succumbs to the defense of qualified immunity.

_____

[19] Cases like *Martin* speak in terms of whether the *plaintiff* has satisfied the test for qualified immunity, which seemingly suggests that the burden is on the plaintiff to show that the defendant is *not* entitled to qualified immunity, rather than on the defendant to show that it *is* entitled to qualified immunity. But that is not the case. The undersigned wonders whether the phrasing in terms of whether *the plaintiff* has satisfied the test results from the fact that it is the plaintiff that needs an affirmative answer to each of the two questions as framed by the Sixth Circuit; to the extent that "satisfying" a test means showing that an affirmative answer is called for in response

It is debatable whether the Supreme Court actually treats the first step as part of the qualified-immunity inquiry, rather than as an inquiry into whether the plaintiff's has simply failed to state a claim as required for the plaintiff generally (irrespective of any qualified-immunity considerations) to survive a Rule 12(b)(6) motion.[20] And as set forth herein, the Court believes

_____

to the questions on the test, it makes sense to speak in terms of whether the plaintiff has satisfied the test.

[20] To be sure, the black-letter law from the Supreme Court seems to be that there are "two prongs of the qualified immunity analysis," *Pearson*, 555 U.S. at 236, namely, whether there was a constitutional violation and whether such violation was a of a clearly established right. *See id.* at 227, 232 (discussing what the two prongs are, as identified in *Saucier v. Katz*, 533 U.S. 194 (2001)). But Supreme Court opinions do not always show clear adherence to the black letter, suggesting instead that the first prong actually is not part of the qualified immunity inquiry.

For instance, in one opinion three justices criticized the "unwise judge-made rule [of *Saucier*] under which courts must decide whether the plaintiff has alleged a constitutional violation before addressing the question whether the defendant state actor is entitled to qualified immunity." *Bunting v. Mellen,* 541 U.S. 1019, 1019 (2004) (Stevens, J., joined by Ginsburg and Breyer, JJ., respecting denial of certiorari). As another example, in *Mullenix v. Luna*, 577 U.S. 7 (2015), the Supreme Court stated, "We address only the qualified immunity question, not whether there was a Fourth Amendment violation in the first place . . . ." *Id.* at 11. In context, though, it is quite clear that what the Supreme Court actually meant was that it was addressing only the *second step* of the qualified-immunity question. In saying that it was not addressing whether there was a constitutional violation, the Court was saying that it was not addressing what the Sixth Circuit has characterized as the *first step* of the qualified-immunity question. And in *Plumhoff v. Rickard*, 572 U.S. 765 (2014), the Supreme Court dealt with the first step entirely outside the rubric of qualified immunity. The Court first held "that petitioners' conduct did not violate the Fourth Amendment," then held that "even if that were not the case, petitioners would still be entitled to summary judgment based on qualified immunity." *Id.* at 778. And in holding that qualified immunity applies, the Court did not even refer back to the first holding; it did not note that the first holding meant that one of two requirements for qualified immunity was satisfied; instead, in referring to qualified-immunity it spoke only in terms of what the Sixth Circuit has referred to as the second of *two* steps of the qualified-immunity inquiry. *See, e.g., id.* at 781 ("[W]e hold that the Fourth Amendment did not prohibit petitioners from using the deadly force that they employed to terminate the dangerous car chase that [the plaintiff-respondent] precipitated. In the alternative, we note that petitioners are entitled to qualified immunity for the conduct at issue because they violated no clearly established law.").

Thus, one wonders whether the Supreme Court in practice actually treats the inquiry of whether there was a constitutional violation as not part of the qualified-immunity inquiry, but rather simply part of the ordinary analysis into whether the plaintiff has a valid claim under Section 1983.

that to say that the first step is not satisfied is to say that the plaintiff's claim fails anyway for lack of a constitutional violation, without the need even to invoke the rubric of qualified immunity.[21] But in accordance with binding precedent, the Court treats both of these steps as part of the qualified-immunity analysis, *i.e.*, as separate requirements that each must be satisfied in order for the plaintiff to avoid the defense of qualified immunity.

In summary, the resolution in the defendant's favor of the first step of the qualified-immunity inquiry necessarily entails not only the existence of a valid qualified-immunity defense, but also the existence of a valid claim on the merits of the plaintiff's claim. But if a defendant does not prevail on this inquiry, it still can obtain qualified immunity by prevailing at the second step.

Although these two steps may be addressed in either order,[22] both steps must be answered in the affirmative for the plaintiff's claim to proceed. *Martin*, 712 F.3d at 957 (citing *Pearson*, 555

---

[21] This belief is bolstered by the quotes above from *Mullenix* and *Plumhoff*. *See Mullenix*, 577 U.S. at 11 ("We address only the qualified immunity question, not whether there was a Fourth Amendment violation in the first place . . . .'"); *Plumhoff*, 572 U.S. at 781 (""[W]e hold that the Fourth Amendment did not prohibit petitioners from using the deadly force that they employed to terminate the dangerous car chase that [the plaintiff-respondent] precipitated. In the alternative, we note that petitioners are entitled to qualified immunity for the conduct at issue because they violated no clearly established law.").

[22] The rule used to be different. Under *Saucier*, whether "the facts alleged show the officer's conduct violated a constitutional right . . . *must* be the initial inquiry" in every qualified immunity case, and only after resolving that inquiry could the court turn to the next, sequential step," *i.e.*, "whether the right was clearly established." 533 U.S. at 201. But *Pearson* overruled *Saucier* in this regard, holding that this sequencing (though often appropriate) was no longer mandatory. *See Pearson*, 555 U.S. at 236.

    On a motion to dismiss in a particular case, the Court (and, for that matter, the briefing parties) naturally would need to consider case-specific variables to determine which step is better addressed first. *See id.* ("[Judges] should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.") For instance, if the primary desired point is that there is a valid defense *both* of qualified immunity *and* failure to state a claim, perhaps the first step should be addressed first. But perhaps the second step should be addressed first if, to give another example, the lowest-hanging fruit is to explain that even if the plaintiff has adequately alleged the violation of a constitutional right, he has not alleged the violation of a *clearly*

---

U.S. at 236). If either step is not satisfied, then qualified immunity shields the government officer from civil damages. *Id.* It follows that if the court finds that one step is not satisfied, it need not reach the other step. *See Klein v. Long*, 275 F.3d 544, 552 (6th Cir. 2001). On the other hand, the court in its discretion may go ahead and address the other step anyway.

With this background in mind, the Court first addresses whether the individual Defendants are entitled to dismissal based on qualified immunity, finding that they are because the FAC's allegations as a whole show that it is not plausible that either step of the qualified immunity analysis would be resolved in Plaintiff's favor. The Court then addresses, alternatively but relatedly, whether individual Defendants (and, for that matter, Defendant Wayne County) are entitled to dismissal on the grounds that (as suggested by the outcome of the first step of the qualified immunity analysis) Plaintiff simply has failed to adequately allege a constitutional violation and thus has failed to state a claim under Section 1983.[23]

---

*established* constitutional violation. Conversely, if the court wishes to explain why qualified immunity does *not* apply, it might decide to start with the first step because the explanation as to how the plaintiff has adequately alleged a violation of a constitutional right might serve as a good foundation for explaining why the plaintiff has adequately alleged that such constitutional right was clearly established. Or the court might decide that it should start by providing the latter explanation, because once it does so it is especially straightforward to make the former explanation.

[23] As discussed in the background section, Plaintiff claims that these actions constitute a violation of his constitutional rights under the First and Fourteenth Amendment, based on compelled speech (Count I), school-sponsored speech (Count II), and selective enforcement (Count III). Each of these three claims is brought against all three Defendants, including against Defendant Franks (at least as to Count III) in his official capacity as well as individual capacity. Plaintiff brings an additional claim (Count IV) against Defendants Byrd and Franks (in their individual capacities) alleging that they conspired to violate the constitutional rights of students at Wayne County High School, including Plaintiff. All of these claims are based on the same alleged constitutional violation: that Plaintiff was compelled to wear the tee shirt (or explain why he did not wish to wear the tee shirt). As noted, because qualified immunity can apply only to a defendant who is sued in his or her individual capacities, the Court here discusses only the claims against Defendants Byrd and Franks in their individual capacities.

1. *Whether Plaintiff has adequately alleged a violation of a constitutional right*

When faced with a motion under Rule 12(b)(6) or 12(c), "[f]irst, a court must decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." *Pearson*, 555 U.S. at 232. Defendants assert that there was no adequate allegation of a violation of a constitutional right of Plaintiff. (Doc. Nos. 83, 85). Plaintiff argues that Defendants' forcing him to speak (through wearing the tee shirt or explaining why he did not wish to wear the tee shirt) was unconstitutional. (Doc. No. 90). The parties assume, for purposes of the Motions, that wearing the tee shirt was a form of speech, and the Court will likewise do likewise *arguendo* without assessing the validity of that assumption.

"[T]he First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 782 (1988). The Sixth Circuit has explained, in detail, First Amendment rights in the school context:

> The "freedom of speech" claim implicates two strands of law that occasionally run into each other. At one level, governmental bodies, including public high schools and universities, have considerable authority to control their own speech. *See Garcetti v. Ceballos*, 547 U.S. 410, 421–22, 126 S. Ct. 1951, 164 L.Ed.2d 689 (2006); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271, 273, 108 S. Ct. 562, 98 L.Ed.2d 592 (1988); *Evans–Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 340 (6th Cir.2010). Foremost among a school's speech is its selection and implementation of a curriculum—the lessons students need to understand and the best way to impart those lessons—and public schools have broad discretion in making these choices. *See Christian Legal Soc'y v. Martinez*, 561 U.S. ——, 130 S. Ct. 2971, 2988–90, 177 L.Ed.2d 838 (2010). This line of authority helps to explain why the First Amendment allows: (1) a public high school to delete stories from the school newspaper—one about teenage pregnancy, the other about the impact of divorce on students—given that the paper "bear[s] the imprimatur of the school" and the school's actions were "reasonably related to legitimate pedagogical concerns," *Hazelwood*, 484 U.S. at 271, 273, 108 S. Ct. 562; (2) a public high school to require students who display a banner bearing the message "BONG HiTS 4 JESUS" during a school-sponsored event to remove the banner or face suspension because schools may "restrict student expression that they reasonably regard as promoting illegal drug use," *Morse v. Frederick*, 551 U.S.

393, 408, 127 S. Ct. 2618, 168 L.Ed.2d 290 (2007); and (3) a law school at a public university to enforce an "all comers" policy requiring registered student organizations to accept all interested students regardless of whether their conduct or beliefs are consistent with the organizations' ideals, *Christian Legal Soc'y*, 130 S. Ct. at 2995 (2010).

The Court, at the same time, has insisted that the public schools are not expression-free enclaves. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511, 89 S. Ct. 733, 21 L.Ed.2d 731 (1969). The free-speech clause generally prohibits suppressing speech "because of its message," and the Court has enforced that prohibition in the public school—indeed the university—setting. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828, 115 S. Ct. 2510, 132 L.Ed.2d 700 (1995). The free-speech guarantee also generally prohibits the most aggressive form of viewpoint discrimination—compelling an individual "to utter what is not in [her] mind" and indeed what she might find deeply offensive—and the Court has enforced that prohibition, too, in the public school setting. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943). This line of authority explains why the First Amendment prohibits public schools from: (1) expelling students who refuse to recite the Pledge of Allegiance, *id.* at 642, 63 S. Ct. 1178; (2) suspending students for wearing black armbands to school to protest the Vietnam War, at least where there is no indication that the students' actions will "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school," *Tinker*, 393 U.S. at 509, 89 S. Ct. 733; and (3) withholding funding for the publications of a student organization because the publication expresses a religious viewpoint, *Rosenberger*, 515 U.S. at 835, 115 S. Ct. 2510.

In reconciling these principles, the Supreme Court tells us that "First Amendment rights" must be "applied in light of the special characteristics of the school environment." *Tinker*, 393 U.S. at 506, 89 S. Ct. 733. That is somewhat helpful. More helpful is this: Public educators may limit "student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273, 108 S. Ct. 562. The neutral enforcement of a legitimate school curriculum generally will satisfy this requirement; the selective enforcement of such a curriculum or the singling out of one student for discipline based on hostility to her speech will not. *See Christian Legal Soc'y*, 130 S. Ct. at 2987–88; *Axson–Flynn v. Johnson*, 356 F.3d 1277, 1289–93 (10th Cir.2004) . . .

*Hazelwood* also features a question crucial to the resolution of all school-speech cases, whether at the high school or university level: Whose speech is it? The closer expression comes to school-sponsored speech, the less likely the First Amendment protects it. *Hazelwood*, 484 U.S. at 271, 273, 108 S. Ct. 562. And the less the speech has to do with the curriculum and school-sponsored activities, the less likely any suppression will further a "legitimate pedagogical concern[ ]," which is why the First Amendment permits suppression under those circumstances only if the speech causes "substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514, 89 S. Ct. 733. To be concrete, *Barnette* involved

forced individual expression that happened to occur in a school, while *Hazelwood* involved restricted student expression through the school's newspaper.

*Ward v. Polite*, 667 F.3d 727, 732–34 (6th Cir. 2012); *see also Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2044 (2021) (providing overview of law regarding the First Amendment in the school context).[24]

The Sixth Circuit has also explained the compelled-speech doctrine as such:

Under the compelled-speech doctrine, "the First Amendment stringently limits a State's authority to compel a private party to express a view with which the private party disagrees." *Walker*, 135 S. Ct. at 2253. While the Government is generally "entitled to say what it wishes and to select the views that it wants to express," *Summum*, 555 U.S. at 467–68, 129 S. Ct. 1125 (citation omitted), it may not do so by forcing a private party to "be an instrument for fostering public adherence to an ideological point of view he finds unacceptable," *Wooley*, 430 U.S. at 715, 97 S. Ct. 1428. "[W]here the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's

---

[24] In this recent opinion, the Supreme Court found that a student's First Amendment rights had been violated when she was disciplined by her coach for posting expletive-laced content referencing her not making varsity on social media. Justice Thomas dissented and expressed concern that the Majority had altered the existing case law on the First Amendment in the school context too much:

The Court transparently takes a common-law approach to today's decision. In effect, it states just one rule: Schools can regulate speech less often when that speech occurs off campus. It then identifies this case as an "example" and "leav[es] for future cases" the job of developing this new common-law doctrine. Ante, at 2046 - 2047. But the Court's foundation is untethered from anything stable, and courts (and schools) will almost certainly be at a loss as to what exactly the Court's opinion today means.

Perhaps there are good constitutional reasons to depart from the historical rule, and perhaps this Court and lower courts will identify and explain these reasons in the future. But because the Court does not do so today, and because it reaches the wrong result under the appropriate historical test, I respectfully dissent.

*Mahanoy Area Sch. Dist.*, 141 S. Ct. at 2063 (Thomas, J., dissenting). Thus, this recent Supreme Court opinion eventually could, as Justice Thomas predicts, change the landscape of First Amendment law in the school context. However, the Court does not perceive any way in which *Mahanoy Area School District* changes the law (including applicable Sixth Circuit case law) in a way that would affect the outcome of the instant Motions.

First Amendment right to avoid becoming the courier for such message." *Id.* at 717,
97 S. Ct. 1428.

*New Doe Child #1 v. Cong. of United States*, 891 F.3d 578, 593 (6th Cir. 2018). The Sixth Circuit

has further explained what constitutes "compulsion" in a compelled speech case:

> State compulsion has been defined largely in the context of compelled
> speech. A "general principle of compelled speech jurisprudence . . . is that a
> violation of the First Amendment right against compelled speech occurs only in the
> context of actual compulsion." *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 189
> (3d Cir. 2005). "In order to compel the exercise or suppression of speech, the
> governmental measure must punish, or threaten to punish, protected speech by
> governmental action that is 'regulatory, proscriptive, or compulsory in nature.' "
> *Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trs.*, 235 F.3d 1243, 1247 (10th
> Cir.2000) (quoting *Laird v. Tatum*, 408 U.S. 1, 11, 92 S.Ct. 2318, 33 L.Ed.2d 154
> (1972)); *see also Axson–Flynn v. Johnson*, 356 F.3d 1277, 1290 (10th Cir.2004).
> The consequence need not be direct; imprisonment, fines, injunctions, or taxes may
> suffice. *Axson–Flynn*, 356 F.3d at 1290; *see also C.N.*, 430 F.3d at 189. "A
> discouragement that is 'minimal' and 'wholly subjective' does not, however,
> impermissibly deter the exercise of free speech rights." *Phelan*, 235 F.3d at 1247–
> 48 (quoting *United States v. Ramsey*, 431 U.S. 606, 623–624, 97 S.Ct. 1972, 52
> L.Ed.2d 617 (1977)) . . .

> In the compelled speech arena, the Supreme Court has struck down a state
> statute requiring schoolchildren to recite the Pledge of Allegiance and to salute the
> American flag, *W.Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642, 63 S.Ct.
> 1178, 87 L. Ed. 1628 (1943), as well as a state statute requiring residents to display
> the state's motto on their license plates, *Wooley v. Maynard*, 430 U.S. 705, 717, 97
> S. Ct. 1428, 51 L.Ed.2d 752 (1977). In contrast, in the absence of state mandated
> penalties coercing an individual to choose a course of conduct, state compulsion
> has not been found. *See Phelan*, 235 F.3d at 1248; *C.N.*, 430 F.3d at 189.

*Wilkins v. Daniels*, 744 F.3d 409, 415 (6th Cir. 2014); *see also Phelan v. Laramie Cty. Cmty. Coll.*

*Bd. of Trustees*, 235 F.3d 1243, 1246–48 (10th Cir. 2000).

In a similar recent case to the one at hand, the NAACP sued over the use of Confederate

symbols in two schools, when the symbols were used in various ways, including being emblazoned

on athletic uniforms. *Hanover Cty. Unit of the NAACP v. Hanover Cty.*, 461 F. Supp. 3d 280, 287

(E.D. Va. 2020) ("*Hanover*"). The court there found that there were not sufficient allegations of

compulsion, and the First Amendment Claim should be dismissed, reasoning that:

Consequently, as long as there is some type of compulsion, requiring students to wear apparel with names or symbols associated with the Confederacy may constitute compelled speech.

However, this question is one that the Court need not resolve at this stage because, to survive a motion to dismiss, the Complaint must allege the NAACP's members were compelled to speak. In other words, the question at issue is whether the School Board has punished or threatened to punish students for refusing to wear apparel with the schools' names or otherwise "resisting the display of their school names or mascots . . . ." (*See, e.g.*, ECF No. 36 at 14.) It does not appear that the School Board has done so. (*See generally* ECF No. 1.) Although the NAACP alleges that students "would be forced to champion the racial inferiority that is inherent in the school names, team and student-body names, cheers, and culture," (*id.* ¶ 88), there is no allegation that the students refused to wear the schools' uniforms or otherwise objected to the school, student body, and team names. There is similarly no allegation that the schools punished, threatened, or "made it abundantly clear that [the students] would not be able to continue in the program" if they did not comply with the uniform requirements. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1290 (10th Cir. 2004). Instead, the Complaint only alleges that, for instance, cheerleaders are required to wear uniforms, not that the cheerleaders were punished, threatened, or banned from the teams for refusing to wear the uniforms. (*See* ECF No. 1 ¶ 91.)

To state a claim for relief, the Complaint must do more than allege that students "are dissuaded from participating in academic and extracurricular activities . . . ." (*Id.* ¶ 88.) Given that the Complaint does not allege a single instance in which a student refused to wear uniforms or other apparel with the names at issue, let alone was punished or threatened for that refusal, the Complaint's allegations that "Defendants compel students participating in extracurricular activities to wear uniforms or other apparel bearing the names [at issue]," (*id.* ¶ 103), and that "Defendants compel students participating in extracurricular activities to identify as 'Confederates' and 'Rebels,' " (*id.* ¶ 104), are conclusory and not sufficient to state a claim for relief. Consequently, the Court will dismiss Claim 1 because it fails to allege that students objected to the school, student body, and team names and that the students were punished or threatened for their objection.

*Hanover*, 461 F. Supp. 3d at 293.[25] In another similar case, the Third Circuit found that a survey given to students was not compelled when there was no discernible punishment associated with not completing the survey (which asked about, among other things, political beliefs):

---

[25] In another part of the opinion, the court further explained the "dissuasion" that students allegedly faced:

> Plaintiffs have not shown the compulsion necessary to establish a First Amendment violation. Even assuming the School Defendants forced students to take the survey, there was no evidence of "some type of disincentive or penalty if the survey was not completed," 319 F.Supp.2d at 492, or if certain answers were or were not selected. The record supports only that students were made to sit in chairs and put pen to paper during administration of the survey. The record does not suggest that School Defendants threatened or actually punished students for failure to complete the survey or to select particular answers.

*C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 189 (3d Cir. 2005); *see also Wilkins*, 744 F.3d at 416 ("The Act imposes a choice on appellants, even though it is not a choice they welcome. Appellants' 'wholly subjective' belief that the Act compels them to join [relevant organizations] is insufficient to trigger either compelled association or compelled subsidy protection under the First Amendment.").[26]

From such cases, it appears that for coercion to exist, there must be not a mere request or suggestion to speak, but rather an actual requirement to speak, backed up by a real threat (or actual likelihood) of punishment for non-compliance. And accordingly, coercion will not be found if the

---

> The NAACP alleges that its members "are dissuaded from participating in academic and extracurricular activities" because of the school and team names. (*Id.* ¶ 88.) One NAACP member requested a variance to allow his or her child to attend a different middle school, but this request was denied, and the family turned to home-schooling. (*Id.* ¶ 89.) Another NAACP member's child attends a specialized academic program at another high school to which the child applied "to avoid attending a school that celebrates the Confederacy and to avoid glorifying Confederate figures through extracurricular activities." (*Id.* ¶ 91.) Other NAACP members' children do not participate in school-sponsored activities because of the school and team names. (*Id.* ¶¶ 92-93.)

*Hanover*, 461 F. Supp. 3d at 287.

[26] The Court understands that Plaintiff naturally might feel uncomfortable about being put in the position of having to say no and may wonder why in the world he was put in that position. But the case law indicates that *a constitutional violation* does not occur merely because someone was put in the unwelcome (as *Wilkins* puts it) position of having to choose to go along or refuse to go along with a request or ostensible "requirement"; a constitutional violation can occur only if punishment is threatened or actually imposed for those who decline to go along.

plaintiff just assumed that there would be punishment for not complying with what the plaintiff claims in litigation was an actual requirement; the idea seems to be that if the plaintiff merely *perceived* that there would be punishment, there was no coercion to speak, but rather only a request or suggestion to speak. *Morrison v. Bd. of Educ. of Boyd Cty.*, 521 F.3d 602, 610 (6th Cir. 2008) (noting in the context of standing that "[t]he claim at stake here involves [Plaintiff's] choice to chill his own speech based on his perception that he would be disciplined for speaking. But whether he would have been so punished, we can only speculate . . . The record is silent as to whether the school district threatened to punish or would have punished [Plaintiff] for protected speech in violation of its policy. [Plaintiff] asks us, essentially, to find a justiciable injury where his own subjective apprehension counseled him to choose caution and where he assumed . . . that were he to speak, punishment would result. We decline to do so.").[27]

*Morrison* suggests that an individual cannot generate their own constitutional standing based on rank speculation that they would be injured (via some kind of punishment) were they not to go along with what the individual later claims in litigation was an enforceable requirement to speak (or not speak). It follows that the individual cannot claim he was injured when he self-imposed a punishment for non-compliance under the assumption that he would have been punished for non-compliance anyway if he did not do it himself; this is vital here because that is what Plaintiff essentially alleges, *i.e.*, that, having tacitly determined that he would not comply, he self-

---

[27] *Morrison* was decided in the context of alleged coerced *silence* rather than alleged coerced *speech*, but the Court does not see why its principles would not apply fully in the latter context as in the former context.

banished himself from the trip under the assumption that he would have been banished for his non-compliance anyway.[28]

This is not to say that a plaintiff has no claim unless he or she refused to comply and was actually punished as a result. But it is not enough for a plaintiff to merely speculate that they would have been punished for non-compliance with something that may have been a mere request or suggestion not enforced by threatened sanctions or actually subject to punishment for non-compliance. Still less is it enough, from what these cases indicate, to have what Plaintiff alleges we have here: a situation where Plaintiff neither was punished nor was required to comply (as he neither wore the tee shirt nor explained why he refused to do so).

The Court also notes that it finds the primary case relied on by Plaintiff to be inapplicable to the facts Plaintiff has alleged in the FAC. In his Response, Plaintiff primarily relies on *Axson-Flynn*, a case in which the Tenth Circuit found compulsion when a Mormon student was told that she would be expelled if she continued to not curse or use God's name in vain during acting exercises, and the plaintiff left the school assuming that continuing not to use the language would result in her expulsion. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1280 (10th Cir. 2004). However, the present case is distinguishable because Plaintiff does not allege that he was *told* that he would be punished for non-compliance. Plaintiff here has not alleged that he actually faced, or was threatened with, any punishment for not wearing the tee shirt (or at least explaining the refusal). Instead, in the FAC, Plaintiff relies on the frequent characterization that wearing the shirts was

---

[28] *Morrison* further suggests that a plaintiff cannot be deemed to have been punished for non-compliance. *Morrison* also seemingly indicates that a person should actually determine (or at least attempt to determine) whether non-compliance is punishable—perhaps with a simple request for exemption from the purported requirement or simple inquiry into the consequences of non-compliance—before coming to court claiming that non-compliance would have been punishable and/or that the person self-inflicted punishment that would have imposed anyway.

"required" or "compelled" and alleges the following facts in an apparent attempt to bolster that

characterization:

- "The students were not permitted to decline to wear the shirts and attend the school-sponsored trip to the Tennessee State Capital building. The students were not permitted to decline to wear the shirts." (Doc. No. 33 at ¶ 2).

- The relevant voicemail did not indicate that wearing the shirts was optional, and stated:

  > "Seniors ***should*** proceed straight to the cafeteria for roll call and you will receive your Senior '19 tee shirt from Representative Byrd. Once you receive your shirt, ***please go to the bathroom and change into it*** and then safely place the shirt you had on somewhere in the school. Buses will leave as soon as shirts have been distributed and we will return around the time school is out." (*Id.* at ¶ 12 (emphasis retained)).

- "When students arrived at school for the senior class trip the shirts were on a table and school staff and personel [sic] directed students toward the table to pick up a shirt. Plaintiff felt compelled to wear the shirt, and further was effectively excluded from a public school-sponsored event as a result of his hestitance [sic] to engage in compelled political speech. The actions, words, and statements of Wayne County School staff, that Plaintiff had to receive a shirt and he should put it on, compelled Plaintiff to either wear the shirt or compelled Plaintiff why he did not want to wear the shirt. In other words, Wayne County School staff's policy and custom of distributing politically-themed shirts on school grounds using school staff, and co-opting students to wear such shirts at a school-sponsored event, compelled Plaintiff to engage in political speech (i.e. wear the shirt as instructed) or explain whay [sic] he should not wear it. Plaintiff has a constitutional right to engage or not engage in political speech and Wayne County School's custom and practice of conditioning a school-sponsored event on the wearing of a shirt containing a political message violates that right. Plaintiff's exclusion will have a chilling effect on his ability and that of others to refrain from participating in compelled political speech." (*Id.* at ¶ 15).

- "Prior to the distribution of the shirts, students were never told that wearing the shirts were optional and faculty of Wayne County Schools consistently gave the impression that wearing the shirts were mandatory. Plaintiff held the belief that the shirts were mandatory to participate in the senior trip based on representations and actions of Wayne County Schools staff. Plaintiff formed this reasonable belief based on the actions and words of Wayne County School officials. As a result of this reasonable belief formed as a result of the actions and words of Wayne County School officials, Plaintiff could not participate in the senior class trip causing him harm and emotional distress." (*Id.* at ¶ 16).

- "Clearly, students that attended the field trip believed wearing the shirt was compulsory as every student photographed on the trip appeared to be wearing the shirt[.]" (*Id.* at ¶ 18).

- "School staff and school personnel communicated to Plaintiff that wearing the shirts was required to participate in the senior-class trip. Plaintiff formed a reasonable belief based on this conduct and the words communicated to him by school staff and school personnel that Plaintiff had to wear the shirt to participate in the senior class trip." (*Id.* at ¶ 45).

These allegations, which are the closest Plaintiff comes to alleging compulsion, are not sufficient to plead a constitutional violation. Nowhere in the FAC does Plaintiff indicate that he was threatened with a punishment or that he actually refused to wear the shirt and was punished as a result.[29] *See e.g.*, *Hanover*, 461 F. Supp. 3d at 293; *C.N.*, 430 F.3d at 189. Importantly, the characterization of tee shirt wearing as "required" or "compelled" does not itself support an inference that punishment would have ensued for non-compliance, and Plaintiff does not otherwise allege any facts suggesting that it would have; for all one can tell from the FAC, a refusal to comply

---

[29] As noted above, the FAC alleges that a student was required either to wear the tee shirt or provide an explanation for refusing to do so, and the Court has construed the FAC to allege that a student exercising either option was engaging in *compelled* speech. The FAC is unclear as to what allegedly would happen to a student who refused to wear the tee shirt but did provide an explanation for the refusal. If providing an explanation truly was an accepted alternative to wearing the tee shirt, that seemingly would mean that a student choosing that option would not be punished for making that choice. But ultimately, the FAC is unclear as to whether Plaintiff claims that a student who refused to wear the tee shirt, but did provide an explanation for such refusal, was subject to punishment. Construing the FAC in Plaintiff's favor as required, the Court construes it as alleging that even if a student refusing to wear the tee shirt complied with the alleged requirement to give an explanation for such refusal, the student still would be punished for not wearing the tee shirt.

In summary, the FAC is unclear as to the alleged consequences for a student exercising the alleged alternative of providing an explanation for a refusal to wear the tee shirt. But the Court construes the FAC, in Plaintiff's favor, as alleging that such a student was (a) compelled to engage in "speech" just as were students who wore the tee shirt; and (b) subject to punishment for exercising that alternative. Under that construction, the "alternative" of providing an explanation actually was illusory, as it would result in punishment just as would refusal to wear the tee shirt *without* providing an explanation. And yet the Court sees no other way to make sense of the FAC's reference to this alternative in a way that cuts in favor of Plaintiff.

with (or a request for an exemption from) the so-called "required" or "compelled" tee-shirt wearing would have been met with nothing more than an "okay," or a "fine, have it your way" from school authorities. In fact, Plaintiff specifically alleges that Plaintiff "*chose* not to go on the senior class trip in lieu of wearing the shirts," not that the school punished him or in some way kept him from attending the trip because he did not wear a tee shirt. (Doc. No. 33 at ¶ 45 (emphasis added)). As suggested above, Plaintiff might wish to re-package his choice as one to impose punishment on himself rather than suffer receiving it from school authorities. But as the Court has concluded above, self-punishment does not qualify as punishment where its impetus was mere speculation that it ultimately would be imposed by the authorities anyway. Instead of a punishment, Plaintiff is merely alleging that he was "dissuaded" from participating in an extracurricular activity, which is the same insufficient allegation that the plaintiffs in *Hanover* made. 461 F. Supp. 3d at 287. Plaintiff also conveys throughout the FAC his (and allegedly other students') subjective belief that they were compelled or required to wear the tee shirt.[30] However, Plaintiff's "wholly subjective" belief that he was compelled to speak in a certain way is insufficient. *Wilkins*, 744 F.3d at 416; *Hanover*, 461 F. Supp. 3d at 287; *Phelan*, 235 F.3d at 1247–48.

---

[30] The Court notes that Plaintiff nowhere alleges facts suggesting that students were compelled to do anything *under pain of negative consequences*. Rather, he provides only the conclusory allegation that he was "not permitted to decline" to wear the tee shirt and rank speculation, unsupported by any factual matter, that he would be punished for declining to wear the tee shirt. Without an actual or threatened negative consequence if one does not take a "required" action, then arguably the alleged "requirement" is merely illusory. However, even if it is enough that a person is told they "must" speak (or are "not permitted to decline" to speak), irrespective of whether they face any sanction for flouting the requirement, as noted above a person's subjective belief that such a requirement exists is insufficient to survive a motion to dismiss. So, a plaintiff's wholly subjective belief that he was compelled to speak (whether or not under pain of sanctions) is not enough to survive a motion to dismiss. As discussed above, in this case, Plaintiff's belief that he was compelled to speak was wholly subjective, as was any belief that he would be *punished* for not wearing the tee shirt, and any belief that he was in some other sense required to wear the tee shirt.

The Court does not mean to begrudge anyone the view that the circumstances alleged in the FAC—whether they include what is best characterized as a request, a suggestion, or a requirement to wear a David Byrd tee shirt—are grounds for concern, disdain, or consequences of one sort or another. But the Court's sole purpose is to determine whether the FAC plausibly alleges a violation of the First Amendment. The Court answers that question in the negative, based on its view of what is required for speech to properly be deemed compelled, as required for a valid First Amendment claim.

Therefore, the Court finds that the FAC does not sufficiently state a constitutional violation. This by itself means that the individual Defendants are entitled to qualified immunity.[31]

### 2. *Whether the constitutional right allegedly violated was clearly established*

Even assuming *arguendo* that Plaintiff has adequately alleged a violation, the Court finds that Plaintiff has not alleged the violation of a constitutional right that was clearly established. As noted above, a constitutional right is deemed "clearly established" as of the time of its alleged violation if "the event occurred such that a reasonable officer would have known that his conduct violated it." *Martin*, 712 F.3d at 957. In other words, the right is clearly established if the defendant reasonably should have known that his conduct violated it. Describing this inquiry in more detail, the Supreme Court has explained:

> The doctrine of qualified immunity shields officials from civil liability so long as their conduct " 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson,* 555 U.S. at 231] (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982)). A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards,* 566 U.S. ——, ——, 132 S. Ct. 2088, 2093, 182 L.Ed.2d 985 (2012) (internal quotation marks and alteration omitted). "We do not

---

[31] It also means, as discussed below, that Plaintiff has failed to state a valid Section 1983 claim. This failure is, under Rule 12(b)(6), an alternative basis for dismissal of the claims against the individual Defendants and also a basis to dismiss the claims against Defendant Wayne County.

require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd,* 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L.Ed.2d 1149 (2011). Put simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L.Ed.2d 271 (1986).

> "We have repeatedly told courts . . . not to define clearly established law at a high level of generality." *al–Kidd, supra,* at 742, 131 S. Ct. 2074. The dispositive question is "whether the violative nature of *particular* conduct is clearly established." *Ibid.* (emphasis added). This inquiry " 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' " *Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S. Ct. 596, 160 L.Ed.2d 583 (2004) (*per curiam*) (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)).

*Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015).

Here, the Court has found that Plaintiff has not adequately alleged that Defendants violated a constitutional right of Plaintiff. If the Court is correct in so finding, as it must and does maintain at this stage of the analysis, then it necessarily follows that the FAC's allegations fail to establish that Defendants reasonably should have known that their conduct violated some constitutional right of Plaintiff. But alternatively, even if the Court is wrong, such an error on the part of the Court would strongly refute that Plaintiff has adequately alleged that Defendants reasonably should have known that their conduct violated Plaintiff's constitutional right(s); after all, if the Court was unable to see in 2021 how the alleged circumstances indicate that Defendants violated Plaintiff's constitutional right(s), it can hardly be said that Defendants should reasonably have seen this in 2018.[32]

---

[32] That is not to say that they should not reasonably have foreseen that the alleged circumstances could generate controversy, discontent, and indignation. But the Court here is concerned only with whether Defendants reasonably should have known that their conduct violated Plaintiff's constitutional rights.

To put the matter differently, Plaintiff, who as noted above bears the burden of refuting the applicability of qualified immunity, must show that "'existing precedent . . . placed the statutory or constitutional question' [allegedly] confronted by the official 'beyond debate.'" *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The Court simply does not see where Plaintiff has made that showing. Even though the plaintiff need not cite a case precisely on point, the plaintiff cannot rely on case law that is applicable only in a very general sense. *See id.* The Court does not see where Plaintiff has cited cases that are more than merely generally applicable to the circumstances he alleges in the FAC; in particular, he does not cite a case reflecting facts (or alleged facts) like those present in the instant case, in which (allegedly) Plaintiff was told he *should* engage in the alleged compelled speech, was *asked* (with a "please" thrown in) to engage in the alleged compelled speech, and was *directed* to a place (a table to obtain the tee shirt and thereafter put it in) where in essence the alleged compelled speech was to begin. That is, Plaintiff does not cite a case in which a court found that these or similar circumstances alone—in the absence of other circumstances, such as actually imposed or at least threatened sanctions for refusing to comply—could support a claim of compelled speech.

Thus, Defendants prevail alternatively on the second prong of qualified immunity just as they prevailed on the first prong.

3. *Whether Plaintiff's failure to adequately allege a constitutional violation requires dismissal irrespective of the applicability of qualified immunity*

The Court is well aware of and embraces the general principle, discussed above, that it is *generally* inappropriate to credit the defense of qualified immunity on a Rule 12 motion and dismiss the complaint accordingly. After all, as suggested above, dismissal at such time is inappropriate unless either (i) the plaintiff fails to plausibly suggest the violation of a constitutional right or (ii) the constitutional right allegedly violated was not clearly established. But the general

rule admits of exceptions, and this is one of those cases: as discussed above, Plaintiff has failed to allege factual matter plausibly suggesting coerced speech, and to the contrary has alleged factual matter suggesting that he was *not* coerced into any speech; moreover the right allegedly violated cannot be said to have been "clearly established" as that term is defined by case law. The Supreme Court "'repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Pearson*, 555 U.S. at 232 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227 (1991) (per curiam)). Here, for the reasons discussed, it is possible to resolve the qualified-immunity question at the instant (pleading) stage.

And the Sixth Circuit's general principle against dismissing complaints on qualified-immunity grounds here actually is inapplicable to a related and alternative basis for dismissing the claims against the individual Defendants (and, for that matter, Defendant Wayne County). Dismissal actually is properly based not just on qualified-immunity grounds, but also alternatively based on Plaintiff's general failure to do what *Iqbal* and *Twombly* require here, namely, alleging factual matter plausibly suggesting an entitlement to relief. Because each of Plaintiff's claims is brought under Section 1983, Plaintiff must plausibly allege a constitutional violation—*i.e.*, a deprivation of a constitutional right—to sustain each claim. *See Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003) ("A § 1983 claim must satisfy two elements: 1) the deprivation of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law." (quoting *Ellison v. Garbarino*, 48 F.3d 192, 194 (6th Cir. 1995)); *Harcz v. Boucher*, 763 F. App'x 536, 540 (6th Cir. 2019) (noting that "[a] § 1983 claim must . . . plausibly stat[e]" these two elements (citing *Tahfs*, 316 F.3d at 590)). If Plaintiff fails to do so, then the FAC is subject to dismissal under Rule 12(b)(6). *See Collins v. Crabbe*, 172 F.3d 872 (6th Cir. 1999) (affirming dismissal of complaint under Rule 12(b)(6), reasoning "that because

the plaintiff has failed to show that the defendants violated a Fourth Amendment right, she has failed to satisfy an essential element of her section 1983 claim"); *Mallory v. Memphis Area Transit Auth.*, No. 21-2409-SHL-TMP, 2021 WL 3356367, at *2 (W.D. Tenn. June 21, 2021) (dismissing a complaint on the grounds that it "fails to state a claim under § 1983 because it does not identify any constitutional right or provide factual allegations sufficient to plausibly establish any constitutional violation"), *report and recommendation adopted*, No. 221CV02409SHLTMP, 2021 WL 3354449 (W.D. Tenn. Aug. 2, 2021).

This is true not only as to the other counts but also as to Count IV, which (unlike the other counts) is based on an alleged conspiracy between the individual Defendants to violate Plaintiff's constitutional rights. It is not enough that the conspirators merely *conspire* (successfully or unsuccessfully) to violate Plaintiff's constitutional rights; rather, the object of the conspiracy must be achieved, *i.e.*, a constitutional violation must actually occur. *Rapp v. Dutcher*, 557 F. App'x 444, 450 (6th Cir. 2014) ("A claim for civil conspiracy under § 1983 exists only where the plaintiff has established a separate and actionable constitutional injury."); *Jones v. Tennessee Dep't of Correction*, No. 3:20-CV-00340, 2021 WL 866487, at *8 (M.D. Tenn. Feb. 1, 2021) (noting that a plaintiff "cannot state a conspiracy claim under § 1983 without plausibly alleging an underlying [constitutional] violation"), *report and recommendation adopted sub nom. Jones v. Tennessee Dep't of Correction*, No. 3:20-CV-0340, 2021 WL 859625 (M.D. Tenn. Mar. 8, 2021).

Here, the Court has found not just that Plaintiff has failed to adequately allege the violation of a *clearly established* constitutional right, but also to adequately allege the violation of a constitutional right, period. In this situation, the Court actually can dismiss the FAC based on general-failure-to state-a-claim grounds, without reference to qualified immunity at all. *See Arsan v. Keller*, No. 3:17-CV-121, 2018 WL 3933706, at *9 (S.D. Ohio Aug. 16, 2018), *aff'd*, 784 F.

App'x 900 (6th Cir. 2019) ("While it is generally inappropriate for a district court to grant qualified immunity on a Rule 12 (b)(6) or Rule 12(c) motion for judgment on the pleadings, for the reasons stated previously in this Decision and Entry, Plaintiff has not alleged sufficient facts in her Complaint to state a claim based on a violation of her Fifth Amendment right against self-incrimination or her Fourteenth Amendment rights for equal protection and due process. Therefore, absent sufficient facts to allege constitutional violations, no qualified immunity analysis is necessary." (citing *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015) (internal citation omitted))).

In summary, the Court will grant the Motions to the extent they argue that Defendants Byrd and Franks are entitled to qualified immunity on the claims asserted against them in their individual capacities.[33] Relatedly, the Court alternatively finds that, as argued in Defendant Wayne County and Defendant Franks' motion, the FAC is subject to dismissal because it fails to adequately allege a constitutional violation.

---

[33] The Court notes that even if mootness is fatal to a plaintiff's request for injunctive relief (as is the case here), a plaintiff's request for monetary damages can save that plaintiff's lawsuit as a whole from a mootness challenge, such that the claims for monetary damages can proceed, unaffected by the mootness challenge. *Curry ex rel. Curry v. Sch. Dist. of the City of Saginaw*, 452 F. Supp. 2d 723, 743 (E.D. Mich. 2006), *aff'd on other grounds sub nom. Curry ex rel Curry v. Hensiner*, 513 F.3d 570 (6th Cir. 2008). However, this principle does not serve to save this lawsuit, because the Court has found that all of Plaintiff's claims fail (to the extent that they seek monetary damages) for reasons other than mootness, as explained herein.

D.  Official capacity claim(s) against Defendant Franks

Plaintiff also brings one or more claims against Defendant Franks in his official capacity as principal of Wayne County High School.[34] (Doc. No. 33 at 2). As far as the Court can tell, Plaintiff grounds Defendant Franks' liability in his official capacity on the assertion that Defendant Franks is on the hook for so-called *Monell* liability (discussed below) because (according to Plaintiff) he personally had a role in developing and implementing Defendant Wayne County's official practice, pattern, and custom of compelled political speech and First Amendment violations. (Doc. No. 90 at 9).

Defendant Franks argues that the official-capacity claims against him should be dismissed as redundant of those against the relevant governmental entity, which is also a named Defendant. (Doc. No. 85 at 6 n.3). Plaintiff argues that the claims against Defendant Franks are not redundant. (Doc. No. 90 at 8-9). Despite Plaintiff's argument, a county official sued in his or her official capacity is typically deemed to be a suit against the county. *Ingram v. Hall*, No. 3:090169, 2009 WL 400126, at *5 (M.D. Tenn. Feb. 18, 2009) (citing *Marchese v. Lucas*, 758 F.2d 181, 189 (6th Cir. 1985)); *Miller v. Burgess*, No. 3:07-CV-00785, 2008 WL 11510394, at *7 (M.D. Tenn. Oct. 29, 2008); *see also Gordon v. Carroll Cty., Tenn.*, No. 12-1118, 2012 WL 3887063, at *1 (W.D. Tenn. Sept. 6, 2012) ("[A] damages suit against [county-official defendants] in their official capacities is a suit against [the county.]"). And especially when the county itself was also named a defendant in the action, the official capacity claims should be dismissed. *See Gordon*, 2012 WL 3887063, at *1 (citing *Cox v. Reagan*, No. 3:06–CV–250, 2009 WL 2579655, at *4 (E.D. Tenn.

---

[34] It seems clear that Count III is brought against Defendant Franks in his official capacity, and Count IV does not appear to be brought against Defendant Franks in his official capacity. It is unclear to the Court whether Count I and Count II are brought against Defendant Franks in his official capacity.

Aug. 17, 2009) (as official capacity suit against officer was essentially a suit against the municipality, which was also a defendant, there was no need to maintain official capacity suit and dismissal was appropriate)). Thus, the Court finds that the claim against Defendant Franks is redundant of the claim against Defendant Wayne County and should be dismissed on that basis alone.[35]

E. Claims against Defendant Wayne County

Plaintiff asserts Counts I, II and III against not just the individual Defendants, but also Defendant Wayne County. These claims are necessarily premised on so-called *Monell* liability.[36]

As discussed above, the claims against the individual Defendants are subject to dismissal due both to the applicability of qualified immunity and (alternatively) Plaintiff's more general failure to state a claim upon which relief can be granted given the failure to adequately allege a

---

[35] The claim of which the official-capacity claim is redundant—*i.e.*, the claim against Defendant Wayne County—is itself subject to dismissal for failure to state a claim. Thus, the official-capacity claim against Defendant Franks would be subject to dismissal on this basis even if it were not dismissed out of hand as redundant.

[36] *Monell* liability is the only cognizable kind of liability under Section 1983 for a municipality. That is, a municipality can be liable under Section 1983 only if the plaintiff establishes that: "(1) the plaintiff's harm was caused by a constitutional violation; and (2) the [municipality] was responsible for that violation." *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 708 (1978)). Municipalities cannot be held liable under Section 1983 on a *respondeat superior* theory. *Monell*, 436 U.S. at 691. Instead, "municipalities are liable for harms resulting from a constitutional violation only when the injury resulted from an 'implementation of [the municipality's] official policies or established customs.'" *Spears*, 589 F.3d at 256 (quoting *Monell*, 436 U.S. at 708 (Powell, J., concurring)) (emphasis in original). A claim of municipal liability requires a showing that the alleged misconduct is the result of a policy, statement, regulation, decision or custom promulgated by the municipal defendant or its agents. *Monell*, 436 U.S. at 690-91. A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom or tolerance or acquiescence of federal rights violations. *Burgess v. Fisher*, 735 F.3d 462, 478 (6th Cir. 2013).

constitutional violation. It is for the second of these alternative reasons that the Court must dismiss the claims against Defendant Wayne County just as it dismissed them against the individual Defendants. In other words, although Defendant Wayne County (unlike an individual defendant) cannot avail itself of the benefits of qualified immunity, it does benefit from the Court's finding that Plaintiff has not adequately alleged a constitutional violation. As a district court in this circuit has described current Sixth Circuit precedent:

> The court in *Lane* acknowledged that in a situation like this, where there has been no violation of a constitutional right and the individual defendants are entitled to qualified immunity, then the city or county "cannot be held liable for violating that right any more than the individual defendants can." *Lane*, 490 F.3d at 423 (citing *Mattox*, 183 F.3d at 524). Rather, the qualified immunity analysis (i.e., the finding of no constitutional violation under the first qualified immunity prong) and official capacity inquiry "is precisely the same in both cases." *Id.* (citing *Moore*, 57 F.3d at 930). *Cf. Colorez*, 441 F. Supp. 3d at 573-74 (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (counties may be sued under § 1983 only if plaintiffs show that the alleged violation of their federal rights occurred because of a county policy or custom; therefore, a threshold for county liability based on policy or custom is that a violation of a federal right occurred)). Thus, even though Nobles and Hogan acted pursuant to a "common practice" of the County in arresting plaintiffs, the County cannot be held liable for a Fourth Amendment violation because the Sixth Circuit found one did not occur. *Enoch II*, 818 F. App'x at 405. Plaintiffs' Fourth Amendment claims against defendants in their official capacity must be dismissed.

*Enoch v. Hamilton Cty. Sheriff's Off.*, No. 1:16-CV-661, 2021 WL 2223894, at *10 (S.D. Ohio June 2, 2021); *see also Scott v. Clay Cty., Tenn.*, 205 F.3d 867, 879 (6th Cir. 2000) ("[O]ur conclusion that no officer-defendant had deprived the plaintiff of any constitutional right a fortiori defeats the claim against the County as well."); *Koch v. Cty. of Franklin, Ohio*, No. 2:08-CV-1127, 2010 WL 2386352, at *16 (S.D. Ohio June 10, 2010) ("Based on the foregoing, the Court concludes that the Deputy Defendants are entitled to qualified immunity on all of Plaintiff's claims against them because, even when viewing all of the evidence in the light most favorable to Plaintiff and making all reasonable inferences in his favor, Plaintiff has failed set forth specific facts showing that there is a genuine issue as to whether he was subjected to any unconstitutional

conduct by the Deputy Defendants. Moreover, since there was no constitutional violation, Plaintiff's official capacity claims also fail."); *Brooks v. Werth*, No. 4:20CV0038, 2020 WL 2615516, at *6 (N.D. Ohio May 22, 2020) ("[B]ecause no constitutional violation has been shown, Plaintiff's *Monell* claim against Chief Werth, in his official capacity, and Boardman Township cannot survive as a matter of law. There can be no liability under *Monell* without an underlying constitutional violation."). This principle applies at the pleading stage; "to prevail in a § 1983 suit against municipal defendants [under *Monell*], a plaintiff must still allege, and ultimately prove, a constitutional violation: if the plaintiff has suffered no constitutional injury, his *Monell* claim fails." *Nichols v. Wayne Cty., Michigan*, 822 F. App'x 445, 449 (6th Cir. 2020) (internal quotation marks omitted).

Thus, the Court will dismiss the claims against Defendant Wayne County.

## CONCLUSION

For the reasons discussed herein, the Court will grant the Motions, and all claims against all Defendants will be dismissed.[37]

An appropriate order will be entered.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[37] As noted in the Factual Background section, also named as Defendants to this action are John Does 1-99 (in their individual and official capacities). For all three of the reasons discussed above variously depending on the particular Defendant involved (Plaintiff's failure to adequately allege a constitutional violation, Plaintiff's failure to adequately allege a violation of a constitutional right that was clearly established, and the redundancy of an official capacity claim asserted against an individual municipal official), the Court finds it likewise appropriate to dismiss these unidentified individual Defendants from the action.